LUKE HALEY v. THE STATE.

No. 2223.   Decided April 16, 1913.

**1.—Theft of Horse—Possession—Security for Debt.**

Where defendant was prosecuted under article 1329, Penal Code, for theft of property which had been left with him as a pledge or security for debt, there was no error in admitting evidence of the preliminary transactions and agreements between the defendant and the prosecutor which led up to the pledge of the alleged stolen horses left in the possession of defendant; besides, the bills of exception were defective in not pointing out the alleged error.

**2.—Same—Evidence—Self-serving Declarations.**

Upon trial of theft of horses left as a pledge in defendant's possession, there was no error in excluding testimony that defendant had brought a civil suit for the possession of said horses since the alleged trade and before the finding of the indictment, as this was self-serving testimony; besides, the bill of exceptions was defective. Following Conger v. State, 63 Texas Crim. Rep., 312.

**3.—Same—Charge of Court—Weight of Evidence.**

Where, upon trial of theft of horses as a pledgee, the court submitted a charge in accordance with the law and the evidence, and defendant complained that the same was on the weight of the evidence, there was no error. Following Duren v. State, 15 Texas Crim. App., 624, and other cases.

**4.—Same—Sufficiency of the Evidence.**

Where, upon trial of theft of horses left as a pledge in the possession of defendant, the evidence, although conflicting, sustained the conviction, there was no error.

Appeal from the District Court of Coryell. Tried below before the Hon. J. H. Arnold.

Appeal from a conviction of theft of horses left in pledge in the possession of defendant; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*R. F. Moore* and *J. W. Stinnett*, for appellant.—On question of pre-

liminary statements between parties leading up to the main contract: Jenkins v. State, 75 S. W. Rep., 312.

*C. E. Lane,* Assistant Attorney-General, and *J. R. McClellan,* District Attorney, for the State.

PRENDERGAST, JUDGE.—Appellant was convicted of horse theft, and his penalty fixed at two years in the penitentiary.

The indictment alleges that on November 15, 1910, H. E. and J..B. Preston sold to said Haley a certain hearse and, at the time, Haley executed to them a note for $400, and also a mortgage on said hearse to secure the payment of said note; that afterwards said Prestons transferred said note and mortgage to W. J. Boykin; that while said mortgage and note were subsisting and valid, Haley sold said hearse to M. B. Bowie, but was himself to pay off said mortgage and get said hearse released therefrom. Said Haley placed in the possession of said Bowie two of his, Haley's horses to be held by Bowie as a pledge until Haley should procure from Boykin a release of said mortgage; that on September 27, 1911, Haley without procuring said release, unlawfully and fraudulently took said horses from Bowie's possession, without Bowie's consent. and with the intent to deprive Bowie of the value thereof and of the value of his said pledge and security, and with the intent to appropriate said horses to the benefit of him, the said Haley.

Under our statute (P. C. art. 1329), " 'Theft' is the fraudulent taking of corporeal personal property belonging to another' from his possession, or from the possession of some person holding the same for him, without his consent, with intent to deprive the owner of the value of the same, and to appropriate it to the use or benefit of the person taking." And art. 1335 provides: "No person can be guilty of theft by taking property belonging to himself, except in the following cases:

"1. Where the property has been deposited with the person in possession as a pledge or security for debt. . . .

"4. In all other cases where the person so deprived of possession is, at the time of taking, lawfully entitled to the possession thereof as against the true owner."

Only a brief statement of the evidence is necessary to show the points decided. Prior to February, 1911, Haley had been in the livery business for some time in Gatesville, Texas. At the time, in his business he had several head of horses, some rolling stock, including the hearse, some harness, etc. About February 11, 1911, he made a contract with Bowie by which Bowie put in certain horses he had, paid an amount in cash to Haley and thereby then acquired from Haley a half interest in all of said property, including said hearse. Bowie testified that at that time Haley told him all of the property was clear, except that he owed $400 and that there was no mortgage on any of the property. Haley testified the same on this point that Bowie did, except that he said he did not then tell Bowie that there was no mortgage on the hearse.

After this partnership trade between them, they continued the livery business until September 25, 1911, when it was agreed between them that Haley should take eight head of the horses, Bowie should keep all the balance of the property, including the hearse, and pay a certain other note owed by Haley, and in addition some cash. That at this time the question came up about the payment of said $400 note and the procurement of a release of said mortgage on said hearse. As a part of the trade of dissolution between them, Haley agreed to pay said $400 note and mortgage on said hearse and relieve it entirely of the lien. And to secure Bowie against this note and lien on the hearse, Bowie was given a lien by Haley on two certain horses which Haley got in this dissolution of the partnership. There was no difference in the testimony between them on all these points. The disputed questions in the case were whether or not Haley placed said two horses in the possession of Bowie to be held by him and in his possession as a pledge for security until Haley paid off said note and mortgage to Boykin and got a release of said hearse; and whether or not taking the horses from Bowie and carrying them off to Brown County was a fraudulent taking or not.

On these two points the evidence was materially conflicting. Bowie testified positively that Haley put, and left these two horses in his possession on September 25, 1911, when they closed the trade between them, the possession to be held by him until Haley paid off said mortgage and secured a release of said hearse; and the State introduced other testimony to the same effect and proved facts and circumstances corroborating Bowie's testimony. On the other hand, Haley testified that while Bowie was to have a lien on said two horses to secure him against said mortgage and lien on the hearse, that he did not turn over to him the possession of said two horses. He had some testimony and circumstances to corroborate him.

Just shortly prior to this trade between Haley and Bowie, someone had recovered a judgment against Haley in the County Court of Coryell County for something over $300 on a debt for which Haley and another were sureties, and he was apprehensive that a levy would be made on his horses, or some of them to make this judgment against him. Shortly before this dissolution between Haley and Bowie and while they were partners, through Haley they made a contract with some show which was to exhibit in Gatesville on the day and night of September 27th, and in the dissolution it was agreed between them that as Haley had made and was familiar with the trade with the show people, he was to work for Bowie until the show was over, and he did that. In this work with the show the livery outfit and teams were used by the parties, Haley himself for Bowie, using some of his, Haley's, horses in this work that day and night, and in that way Haley was in possession of one or the other, or perhaps both of said two certain horses during that time. Both of them, during the day and the early part of that night, were in and out and about Bowie's livery stable, during the whole time. Haley had informed Bowie theretofore that because of said judgment

against him he was going to leave Gatesville at night, but did not tell Bowie what time he was going to leave, nor where he was going. After the show was over, Bowie left the stable going to his home to go to bed and did do so. This was some time about 11 o'clock at night and Haley knew this. About the same time that Bowie left for his home, Haley also left the stable for his, but in about a half hour after Bowie had left the stable, Haley came back to the stable, proceeded to hitch up these two horses which Bowie was to hold as security against said mortgage, against the protest and objection of Bowie's employe who was at the stable. The employe at the time telling him that he was liable to get into trouble by taking said horses. Haley replied that he knew what he was doing. He thereupon took said two horses out of the stable, left Gatesville with them that night about 12 o'clock without any of the parties knowing where he was going or the direction. He got a companion and traveled all that night with these horses, carrying the six other head that he got in the dissolution of the partnership. He traveled all that night and until about daylight the following morning, when he reached his brother-in-law's, where he stayed some hours. He then proceeded on his journey for the next two or three days, not in a direct route from Gatesville to Brownwood—these places being sixty miles apart—but in a circuitous and much longer route, reaching Brownwood two or three days later. Immediately after Haley took said horses out of said stable and left with them, Bowie's employe went to Bowie's house and informed him what Haley had done. Bowie at once applied to the sheriff's department, telling him of the circumstance and he and the sheriff's force undertook to locate and arrest Haley. This search and inquiry was kept up for several days, the sheriff sending out notices to the various peace officers in different directions over the State and among others, to the sheriff's department at Brownwood, describing Haley and the horses. About a week later the sheriff of Brown County located Haley and said horses at Brownwood and arrested him and got said two horses. Haley claimed that he intended to return said horses, did not intend to sell them, but intended to sell all of the other six. Haley never paid said note and never got the release of said hearse from said mortgage lien.

Appellant has two bills of exception. The first is as follows: "Be it remembered that upon the trial of the above entitled and numbered cause, while M. B. Bowie was on the stand testifying in behalf of the State, he was asked by the State to tell and detail the trade that he made with the defendant, when he first came over here with reference to the purchasing an interest in the livery stable with the defendant. To which question the witness answered: 'Before I moved to Gatesville I made a trade with Mr. Haley (the defendant) in which I acquired a half interest in his livery business here in Gatesville. I had nine horses and defendant had ten and his rolling stock, and I gave him $400 in money. Haley had a hearse in the stable that went with the deal. He and I were equal partners in the business, in all the horses, rolling stock,

including the hearse. I bought his half interest in February, 1911.'"
Appellant objected to this testimony because it relates to another and
independent transaction between him and Bowie and had no connection
with the transaction for which he was being tried, and was irrelevant.
The bill further states that appellant was prosecuted for the theft of
said two certain horses which he had pledged to Bowie by an inde-
pendent contract entered into on or about September 27, 1911, and
claimed that said testimony could serve no purpose other than to preju-
dice his rights before the jury. The court, in approving this bill, did
so with this qualification: "I deem it not improper to state that evi-
dence of the above trade between the defendant and Bowie and to which
they were both privy, was admitted to show how Bowie acquired a half
interest in the property in question from Haley. The respective prop-
erty rights of said parties depended on said transaction, and evidence
regarding the same was admissible under the view of the court to prop-
erly show such property rights, and to explain how it happened that
Haley later pledged the horses in question to Bowie."

The next bill is as follows: "Be it remembered that upon the trial
of the above entitled and numbered cause, while M. B. Bowie was on
the stand as a witness testifying as a witness in behalf of the State, he
was asked by the State: 'At the time you bought your half interest in
the livery business, state what the defendant told you in regard to the
property he was putting into the partnership business being clear and
free from mortgage?' The witness answered: 'Before I made the
trade with the defendant I asked him if there was anything against the
property or if he owed anything on it and he said that he owed $400
on it, but that he could take it up at any time, and I asked him if there
was any mortgage against any of it and he said there was not.'"
Appellant objected to this testimony, because said transaction and state-
ment, if made, were too remote and relates to another and different
transaction from that for which appellant is being prosecuted and has
no connection with the transaction for which he is being prosecuted,
and throws no light on it, and is irrelevant, immaterial and prejudicial
to his rights, and could serve no purpose other than an attempt by the
State to place him before the jury as a man unworthy of belief; and
in an indirect manner attempt to impeach him upon immaterial and
collateral matter, claiming that said question and answer had no ref-
erence to the original trade made between appellant and Bowie at the
time Bowie bought a half interest in said livery in February, 1911, he
being prosecuted upon an alleged agreement of pledge of said property
entered into between him and Bowie on September 25, 1911. The
court, in allowing this bill, qualified it exactly as he did the one above.

It will be seen that neither of these bills nor both together make any
such statement of the status of the case and the evidence so as to point
out any error. He accepted the bills as qualified by the judge and is
bound thereby. With the qualification the bills point out no reversible
error. But, even taking the bills in connection with the record, if we

could look to it, in our opinion this testimony was pertinent and admissible.

By another bill it is shown that while said Bowie was testifying in behalf of the State and after having been examined by the State, and was being cross-examined by appellant, he was asked by him: "Is it not a fact that the defendant has sued you by civil suit for the possession of the horses since the trade and before the finding of this bill of indictment?"   To this question the State objected on the ground that the same would be self-serving.   The court sustained the objection. The witness would have answered, if permitted, that he had brought such suit and it was still pending.   Appellant claimed that this testimony was material to his rights and defense would throw light upon his good faith in his acts and in his contention that he was entitled to the possession of said horses and that it would throw light upon the construction of the contract of security, as understood at all times by him, to the effect that he did not at any time intend to part with the possession of said horses.   This bill is clearly insufficient under all the rules to require this court to review the question.   Conger v. State, 63 Texas Crim. Rep., 312, and authorities therein cited.   However, if we could consider the bill and look to the record, we would see that this suit was brought long after the commission of the alleged offense by appellant and was clearly inadmissible, because, as objected to by the State and sustained by the court, it was clearly self-serving.

In one ground of appellant's motion for new trial, he complains that the charge of the court was one on the weight of the evidence.   The whole of that ground of his motion is:   "Because the court erred in that part of his charge to the jury wherein he charged, meaning defendant, 'did fraudulently take from the possession of the said M. B. Bowie the said two horses which had been so pledged by said Haley to the said Bowie' and in this connection not permitting them by proper words in the charge to determine whether they had been pledged, and erred further in his charge, wherein he charged: 'To deprive the said M. B. Bowie of the value of said two horses and of the value of his security which had been so pledged.'   Because said charge is upon the weight of the evidence and calculated to mislead the jury to the prejudice of the defendant."   The charge of the court first stated the case to them and that appellant had plead not guilty.   He then correctly charged our general theft statute, quoting the statute.   Then told them no person can be guilty of theft by taking property belonging to himself, except in the case where the property has been deposited with the person in possession, as security for debt.   Then submitted the case to them as follows:   "Now if you believe from the evidence beyond a reasonable doubt that on or about the 27th day of September, A. D. 1911, in the County of Coryell and State of Texas, the two certain horses mentioned in the indictment in this case, were then and there the corporeal personal property of and belonging to Luke Haley, but that the said two horses had theretofore been deposited with and placed

in the possession of the said M. B. Bowie by the said Luke Haley as a pledge or security for a debt so owing by the said Luke Haley to one W. J. Boykin, and that said debt was evidenced by a note and mortgage bearing date the 15th day of November, A. D. 1910, and signed by the said Luke Haley payable to the order of H. E. and J. B. Preston and transferred by said Prestons to W. J. Boykin, and that the said note and mortgage was secured by a valid subsisting lien on that certain hearse mentioned in the indictment, same being the hearse sold by H. E. and J. B. Preston to the said Luke Haley and by Haley sold to M. B. Bowie as alleged in the indictment, and that the two horses mentioned in the indictment had been placed in the possession of M. B. Bowie by the said Luke Haley to be held by him, M. B. Bowie, until the said Luke Haley should procure a release from the said W. J. Boykin of the mortgage and lien on the hearse in question, and if you further believe from the evidence beyond a reasonable doubt that the said Luke Haley, without having procured from the said W. J. Boykin a release of the mortgage and lien held by him against the said hearse, did, in Coryell County, Texas, fraudulently take from the possession of the said M. B. Bowie the said two horses which had been so pledged by the said Haley to the said Bowie, without the consent of the said M. B. Bowie, and with the intent then and there on the part of him, the said Luke Haley, to deprive the said M. B. Bowie of the value of said two horses, and of the value of his security and pledge and with the intent to appropriate said two horses to the use and benefit of him, the said Luke Haley, then in the event you so find you will convict the defendant of theft as charged in the second count in the indictment and assess his punishment at confinement in the penitentiary for not less than two nor more than ten years." He also charged the presumption of innocence and reasonable doubt in the standard approved charges on that subject, and told them that if they had a reasonable doubt as to his guilt to acquit him. In addition and in a separate paragraph, he also charged them:

"If you should have a reasonable doubt that the two horses in question had been placed in the possession of M. B. Bowie as a pledge and security for debt as alleged in the indictment or that the defendant fraudulently took possession of said horses with the intent to defraud the said M. B. Bowie and deprive the said M. B. Bowie of the value of his security and pledged property, you will acquit the defendant." The above is the only complaint appellant has of the whole charge. In our opinion the court's charge was not upon the weight of the evidence, but was a clear and apt submission of the question to the jury in accordance with the law and the evidence. P. C., arts. 1329 and 1335. Duren v. State, 15 Texas Crim. App., 624; Connell v. State, 2 Texas Crim. App., 422; State v. Stephens, 32 Texas, 156.

The only other claimed error by appellant is that the evidence is insufficient to sustain the verdict. We have carefully considered the evidence and while it is conflicting and would have authorized the jury,

if they had believed appellant and his witnesses, to acquit him, still there was ample evidence by the State to authorize the jury to find the defendant guilty as it did. This being a disputed question and properly, fully and fairly submitted by the court to the jury, we would not feel authorized to set the verdict and judgment aside.

The judgment will, therefore, be affirmed.

*Affirmed.*